In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-1029

JEFFREY ALLEN, et al.,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 3183 — **Sidney I. Schenkier**, *Magistrate Judge*.

ARGUED APRIL 6, 2017 — DECIDED AUGUST 3, 2017

Before EASTERBROOK, MANION, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal arises from a Fair Labor Standards Act collective action. Plaintiffs are current and former members of the Chicago Police Department's Bureau of Organized Crime who claim that the Bureau did not compensate them for work they did off-duty on their mobile electronic devices (BlackBerrys). The case was tried to the court, Magistrate Judge Schenkier, presiding by consent under 28

U.S.C. § 636(c). The judge issued detailed findings of fact and conclusions of law in favor of the Bureau, finding that it did not prevent plaintiffs from requesting payment for such non-scheduled overtime work and did not know that plaintiffs were not being paid for it. Plaintiffs appeal, but we find no persuasive reason to upset the judgment of the district court. We affirm the judgment for the Bureau.

I.   *The Fair Labor Standards Act*

We begin by explaining the standards that apply under the Fair Labor Standards Act when an employer asserts that it did not know of the overtime work for which employees claim they were not paid. The Act, codified as 29 U.S.C. § 201 *et seq.*, requires employers to pay covered employees at one-and-a-half times their usual pay rate if they are employed for longer than a certain hourly threshold. That threshold is usually forty hours per week. § 207(a)(1). For law enforcement employees like these plaintiffs, the threshold is one hundred and seventy-one hours per twenty-eight day period. § 207(a)(1) & (k); 29 C.F.R. § 553.230(b).

The statute defines "employ" broadly, as "to suffer or permit to work." § 203(g). That broad definition is central to the purpose of the Act. It helps prevent evasion by employers who might seek to issue formal written policies limiting overtime that are widely violated, or who might deliberately close their eyes to overtime work their employees are doing. See *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (employer cannot "sit back and accept" work without compensating it, even if employer has rules against overtime work), quoting 29 C.F.R. § 785.13. Employers must, as a result, pay for all work they know about, even if they did not ask for the work, even if they did not want the work done, and even

if they had a rule against doing the work. *Id.*, citing *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008). If the employer does not want to pay overtime, its management must "exercise its control and see that the work is not performed." 29 C.F.R. § 785.13.

That strict rule has a limit, however. It "stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Kellar*, 664 F.3d at 177. The employer's knowledge can be either actual or constructive. *Id.* An employer has constructive knowledge of an employee's work if it should have acquired knowledge of that work through reasonable diligence. *Hertz v. Woodbury County*, 566 F.3d 775, 781 (8th Cir. 2009).

One way an employer can exercise diligence is by establishing a reasonable process for an employee to report uncompensated work time. That principle has been at least implicit in our cases. In *Gaines v. K-Five Construction Corp.*, 742 F.3d 256, 271 (7th Cir. 2014), for example, we affirmed summary judgment for an employer that did not know the plaintiff was working overtime. We reasoned, in part, that although the employer gave its employees a form on which to record their time, the plaintiff did not use the form as intended: he noted the overtime in a margin note on the wrong part of the form and omitted it when completing the appropriate section. That misuse prevented an inference that the employer knew about the overtime. *Id.*

The Sixth and Ninth Circuits have been more explicit, affirming summary judgment for employers who set up processes for reporting overtime that the plaintiffs did not use. *White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) (affirming summary judgment for employer:

"When the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee … ."); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) (affirming summary judgment for employer: "where an employer has no knowledge that an employee is engaging in overtime work and that employee … deliberately prevents the employer from acquiring knowledge … , the employer's failure to pay … is not a violation of [§] 207"). We agree with their reasoning.

But an employer's formal policy or process for reporting overtime will not protect the employer if the employer prevents or discourages accurate reporting in practice. *White*, 699 F.3d at 876 (distinguishing cases "where the employer prevented the employees from reporting overtime"). Such employer misbehavior might be overt. In *Allen v. Board of Public Education*, 495 F.3d 1306, 1316 (11th Cir. 2007), for example, plaintiff-employees were told that they should not record their overtime hours and that their employer would not pay overtime. Accurate time sheets were rejected, torn up, or edited. Or the employer might be more subtle. In *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825, 827 (5th Cir. 1973), the employees' jobs demanded "long and irregular hours," but their supervisors "insisted that all work be completed within certain defined time limits." The employer's practices effectively "squelched truthful responses" in overtime reports. *Id.* at 827–28.

II. *Factual and Procedural Background*

With that legal background, we turn to the facts of this case, which comes to us following a trial to the court. We

therefore review the district court's factual findings deferentially, and our account of the facts tracks its factual findings. See Fed. R. Civ. P. 52(a)(6) ("Findings of fact … must not be set aside unless clearly erroneous … ."). We focus especially on the court's findings about the Bureau's knowledge of plaintiffs' overtime reporting, the issue central to the district court's decision and this appeal.

This case was brought by Jeffrey Allen and fifty-one other opt-in plaintiffs. Plaintiffs are current or former members of the Chicago Police Department's Bureau of Organized Crime. (Although the City of Chicago is the defendant here, the focus is on practices specific to the Bureau, though we must consider some actions of the larger Chicago Police Department.) The Bureau is a prestigious assignment for Chicago police officers. Its members conduct sophisticated investigations into, for example, gangs, narcotics trafficking, and human trafficking. Although members have scheduled shifts, the nature of their work sometimes requires them to work outside their shifts during what would otherwise be off-duty time. The police department issued plaintiffs mobile electronic devices (BlackBerrys), which they sometimes used in their off-duty work. This suit is over whether they were appropriately compensated for off-duty work on their BlackBerrys.

The police department has a process that officers use to obtain overtime compensation: they submit "time due slips" to their supervisors. The slips are small; there is some space for explaining what work was done, and officers usually put a short, vague phrase in the space. The slip does not ask how the work was done, and officers do not typically include that information. Supervisors approve the time, and the slips are sent to payroll and processed. Plaintiffs regularly used that

system; the fifty-two plaintiffs collectively reported and received pay for three to four thousand overtime hours per year from 2011 to 2014. But during the period relevant to this suit, many plaintiffs did not submit slips for off-duty work done on mobile electronic devices.

The central question in the trial court was whether plaintiffs were prevented or discouraged from submitting slips by an unwritten policy of the Bureau's.[1] The district court certified an FLSA collective action before discovery, then after discovery refused to decertify the collective action, denied summary judgment, and held a bench trial. After a six-day bench trial, the court ruled for the Bureau in a thorough memorandum opinion.

The court resolved several preliminary questions before addressing whether the Bureau had the unwritten policy plaintiffs alleged. The court agreed with plaintiffs that some of their off-duty BlackBerry activity was work that was compensable under the FLSA. It acknowledged evidence that Bureau supervisors knew plaintiffs sometimes worked off-duty on their BlackBerrys. But the court also found that the supervisors did not know or have reason to know that plaintiffs were not submitting slips and therefore were not being paid for that work. Although supervisors in theory could have checked what they knew of plaintiffs' off-duty work against the time slips they approved, the court found that requiring them to do so would be impractical: supervisors approved a

---

[1] Plaintiffs tell us that they did not specify whether the policy was written or unwritten; they attribute the "unwritten policy" framing to the district court. Plaintiffs' complaint did not refer to an unwritten policy, but their response to the Bureau's decertification motion did, as did their pre- and post-trial proposed findings of fact.

large number of slips per day, and slips were sometimes sub-
mitted and reviewed well after the work was performed.
Also, the court found, plaintiffs never told their supervisors
that they were not being paid for such work.

The court then turned to the central question: whether
plaintiffs had shown the existence of an unwritten policy not
to compensate them for off-duty work performed on their
BlackBerrys. It considered four categories of plaintiffs' evi-
dence of such a policy: evidence of (1) a Bureau-wide belief
that officers should not turn in slips for BlackBerry work; (2)
written policies to that effect; (3) pressure to reduce overtime
in general; and (4) pressure not to seek compensation for
BlackBerry work in particular.

On the first point, the evidence was in conflict. Some plain-
tiffs testified that the Bureau's culture would frown on sub-
mitting slips for BlackBerry work. But other Bureau officers,
including some plaintiffs, submitted slips for such work and
were never denied compensation. Some supervisors know-
ingly approved slips submitted for such work; others proba-
bly did so without knowing it since the slips did not indicate
whether the work was done on a BlackBerry or not. No one
ever told plaintiffs not to submit slips for that work, and no
one was ever reprimanded or disciplined for submitting such
slips. All told, the court concluded, the evidence did not bear
out the common culture plaintiffs alleged.

Plaintiffs' second point focused on four documents. The
first was a "General Order" issued by the Chicago Police De-
partment in October 2010. The order established "guidelines
and responsibilities" for officers using department-issued
electronic devices. The order said that officers were not re-
quired to use such devices while off-duty. It said that officers

would not be compensated for such use except in two circumstances: if the officer was on a "call-back" assignment (a term defined in collective bargaining agreements) or if a superior directed and authorized overtime for the work. The order also introduced the second significant document, a "Compliance Statement," to be signed when an officer received a device. By signing, the officer acknowledged that he would "not be compensated" for accessing the device off-duty except under the same circumstances explained in the order.

In 2013, the Department issued another General Order on the same topic. It repeated many of the 2010 Order's points word-for-word. But instead of saying that officers would "not be compensated" for off-duty device use except under certain circumstances, it said that off-duty officers "will not use" devices except under those circumstances. The Bureau's chief issued a memorandum to the Bureau's deputy chief and commanders reiterating that the 2013 General Order applied to the Bureau, although he did not distribute the memorandum to lower-ranking officers.

The district court wrestled with the orders, noting confusion about what they were meant to accomplish and expressing disappointment that the Bureau never made a "simple written statement" on compensation of BlackBerry work. Despite the confusion, the court made two important findings. First, it rejected plaintiffs' trial position on the orders. Plaintiffs contended that the orders required them either to obtain a supervisor's approval before working overtime or to forgo compensation. The court disagreed, noting that the orders described themselves as "guidelines" and that neither plaintiffs nor the Bureau ever acted as though the orders required pre-

approval of overtime. Second, in a lesson that might not surprise students of organizational behavior, the court found that the orders actually had no effect on plaintiffs or their supervisors. The judge emphasized the uniform testimony to that effect, as well as the witnesses' incomplete and inconsistent understandings of the orders' meaning. As a result, the judge found that the orders neither created a policy not to compensate plaintiffs nor reaffirmed an existing unwritten policy.

The third and fourth categories of plaintiffs' evidence posed fewer problems. The district court noted testimony that the Bureau sporadically tried to reduce its officers' overtime. Supervisors occasionally discussed the topic and sent emails to their subordinates about reducing overtime requests. This was not a concerted effort, and it was unsuccessful. Total overtime in the Bureau did not decrease, and plaintiffs' overtime increased over the relevant period. No plaintiff changed how he or she handled overtime slips for BlackBerry work because of these efforts. Nor did Bureau supervisors deter submission of slips for BlackBerry work. Plaintiffs cited two examples of alleged pressure, but both addressed overtime generally, not BlackBerry work specifically, and neither became common knowledge. Plaintiffs also emphasized that their supervisors did not tell them to submit slips for BlackBerry work, but the court found that the Bureau's overtime procedure did not require such directions. Officers usually submitted slips without being told to do so.

After its discussion of plaintiffs' arguments and the evidence, the court found that plaintiffs had not shown that the Bureau maintained an unwritten policy to deny them compensation for off-duty BlackBerry work. It ruled in the Bureau's favor.

III. *Analysis*

Plaintiffs convinced the district court that they worked overtime on their BlackBerrys. But plaintiffs also had to show that the Bureau actually or constructively knew they were not reporting that work. According to the district court, they failed. We review the court's legal conclusions *de novo* and its factual findings for clear error. *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017), citing *Ernst v. City of Chicago*, 837 F.3d 788, 795–96 (7th Cir. 2016).

Plaintiffs make two legal arguments: (1) that the district court's decision is unprecedented; and (2) that the district court misapplied the constructive knowledge standard. But their primary arguments are factual; they take an "any of the above" approach to challenging the district court, arguing that the Bureau actually knew about their underreporting, or should have known, or caused it. Because they rely on the same evidence to support each theory, we consider the theories together, although we do not consider several arguments made for the first time on appeal.

A. *Legal Error*

Plaintiffs believe three of the district court's findings make this case unique: (1) that plaintiffs performed compensable off-duty work; (2) that their supervisors knew about the work; and (3) that their supervisors neither knew nor should have known the plaintiffs were not compensated for that work. No case in this or any other circuit, they claim, shares those features. That is not correct. The district court cited such a case, which plaintiffs do not attempt to distinguish: *White v. Baptist Memorial Health Care Corp*. The plaintiff in that case, a nurse, was not compensated for her meal breaks because she usually

did not work during them. 699 F.3d at 872. If the meal break was interrupted by work, she and her co-workers were supposed to record their work in a log book to be paid for the time. The employer also had a procedure employees could use to report payroll errors. The plaintiff did not use either process but later sued to be paid for interrupted meal breaks. *Id.* at 872–73. Even though she sometimes told her supervisors that she worked during her meal breaks, the district court granted summary judgment for the employer and the Sixth Circuit affirmed. The court reasoned that the plaintiff never told anyone that she was not being paid for missing her meal breaks, even though her employer had a reporting system and did not prevent her using it. *Id.* at 876–77.

*White* parallels what the district court found happened here. Plaintiffs in this case, like the nurse in *White*, worked time they were not scheduled to work, sometimes with their supervisors' knowledge. They had a way to report that time, but they did not use it, through no fault of the employer, according to the district court's factual findings. Reasonable diligence did not, in the district court's view, require the employer to investigate further. Since, as we explain below, we see no clear error in that view of the facts, we see no legal error in reaching the same conclusion as the *White* court.[2]

Plaintiffs also claim that the district court misapplied the concept of constructive knowledge, but they are not clear about what the court's error was. Plaintiffs seem to contend

---

[2] The *White* panel was divided on whether the case should have been resolved on summary judgment. See *White*, 699 F.3d at 879–84 (Moore, J., dissenting). In this case the trial record reveals genuine issues of material fact that could not have supported summary judgment.

that constructive knowledge should be found whenever the employer could have known about uncompensated work through, for example, examining all its records. In this case, the Bureau could have discovered plaintiffs' uncompensated BlackBerry work by comparing the time slips to call and email records the BlackBerrys generated, and so (plaintiffs reason) it should be deemed to have had constructive knowledge of the unpaid work.

The Bureau contends that we need not address that argument. It reads *White* to hold that an employer's constructive knowledge is categorically irrelevant if its employee has intentionally falsified his time records. *White* did not go that far. It held that "if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process." *Id.* at 876. But *White* distinguished cases in which "the employer prevented the employees from reporting overtime or were otherwise notified of the employees' unreported work," and listed several such cases. *Id.* (collecting cases). The Bureau believes the court's "otherwise notified" language means that only an employer's actual knowledge suffices. But *White*'s list of example cases included *Reich v. Dep't of Conservation & Natural Resources*, 28 F.3d 1076, 1083–84 (11th Cir. 1994), which the *White* court characterized as a case in which the "employer had constructive knowledge." 699 F.3d at 876. That undercuts the Bureau's broad interpretation.

Moreover, such a broad interpretation of *White* equates reasonable diligence with a reasonable reporting process, implying that all an employer ever needs to do is establish a rea-

sonable process for reporting overtime. We see no need to create such a blanket rule. The requirements of reasonable diligence depend on the facts of each case. *White* did not change that, and neither do we.

Nor do we accept plaintiffs' position, which would break still more sharply with established precedent. The reasonable diligence standard asks what the employer should have known, not what "it could have known." *Hertz*, 566 F.3d at 782, citing *Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997); *Craig v. Bridges Brothers Trucking LLC*, 823 F.3d 382, 392 (6th Cir. 2016) ("Some cases may lend themselves to a finding that access to records would provide constructive knowledge of unpaid overtime work, but that is not a foregone conclusion.") (quotation omitted); *Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995) (holding, as a matter of law, that employer's access to records reflecting uncompensated overtime "does not constitute constructive knowledge"). The district court applied that standard correctly here.

## B. *Waiver*

It is "well settled that arguments presented for the first time on appeal are waived." *Bailey v. International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local 374*, 175 F.3d 526, 529 (7th Cir. 1999). That rule serves several important purposes, including that it keeps appellate courts from resolving questions "that require the factfinding abilities of the district judge." *Id.* at 530. The rule also protects both parties' ability to present evidence in support of their positions. See *Singleton v. Wulff*, 428 U.S. 106, 119–21 (1976) (reversing "unacceptable" appellate court decision to proceed to merits questions not considered in trial court in part because

losing party "has had no opportunity" to offer evidence or arguments); cf. *Rowe v. Gibson*, 798 F.3d 622 (7th Cir. 2015) (divided panel debating appropriateness of appellate court conducting its own factual research), rehearing en banc denied by equally divided court, 2015 WL 10767326 (7th Cir. Dec. 7, 2015).

On appeal, plaintiffs have argued new factual theories, including interpretations of the evidence not argued to the district court.[3] They argue, correctly, that we have discretion to consider arguments raised for the first time on appeal. See *County of McHenry v. Insurance Co. of the West*, 438 F.3d 813, 820 (7th Cir. 2006). We use that discretion rarely, however, when the waiver "has caused no one—not the district judge, not us, not the appellee—any harm of which the law ought to take note." *Amcast Industrial Corp. v. Detrex Corp.*, 2 F.3d 746, 749 (7th Cir. 1993). We may use it "to entertain arguments that turn on pure issues of law," particularly arguments that would have been foreclosed in the district court by binding precedent. *Hively v. Ivy Tech Community College of Indiana*, 853 F.3d 339, 351 (7th Cir. 2017) (en banc). Plaintiffs' arguments are not in that category. They would require us in effect to retry the case on a cold record. We do not consider them.

That decision covers two of plaintiffs' arguments. They argued on appeal that their complaint gave the Bureau actual knowledge that they were working without compensation; they did not make that argument to the district court. They

---

[3] The Bureau raised the waiver issue in its appellate briefing; in their reply, plaintiffs asserted that the allegedly waived issues "were raised, often repeatedly, during the trial." They did not cite the record to support that claim, and our review of the record produced no support for it.

also argued on appeal that the Bureau's culture discouraged compensation for all "not significant" overtime—short-duration work, work on administrative tasks, and work performed from home. But in the district court, they argued only that the Bureau discouraged compensation for work done on a Black-Berry. They did qualify that argument, conceding that the Bureau would compensate certain kinds of BlackBerry work, including long stretches of work. But the broader argument that all insignificant overtime was forbidden is new on appeal.

C. *Factual Errors?*

We turn to the factual arguments that are properly before us. Plaintiffs argue that the district court got the facts of this case wrong—that it clearly erred by holding that the Bureau did not actually or constructively know they were underreporting their overtime or pressure them to do so.

We reject these arguments. First, plaintiffs emphasize that the Bureau knew they worked overtime on their BlackBerrys. As we have explained, that point does not win the case. The district court agreed that the Bureau knew about at least some off-duty BlackBerry work. But it also found that the Bureau did not know that such work was not being reported and paid. Repeating the former point does not respond to the latter.

Second, plaintiffs emphasize that their supervisors did not tell them to submit slips for BlackBerry work. But supervisors did not give those instructions for any particular type of work. As the district court found, plaintiffs and other officers knew the procedures for claiming overtime pay and used them without regular reminders.

Third, plaintiffs point out that supervisors remembered approving very few slips for BlackBerry work and that the Bureau was not able to produce many slips submitted for that work. True, but as the district court found, that was because slips need not and usually did not say how work was done.

Fourth, plaintiffs argue that the Bureau could and should have cross-referenced slips that had been submitted against either phone records or supervisors' knowledge of overtime to ensure that its employees were reporting their time correctly. Plaintiffs cite supervisors who said that they regularly looked at slips and called plaintiffs' proposal "possible." Those citations in plaintiffs' appellate brief edit out contrary testimony describing plaintiffs' proposal as "burdensome" and "an impossible task."[4] Given that testimony, the district

---

[4] Elsewhere in their brief, plaintiffs selectively quote a former chief of the Bureau. The witness explained that when he was non-exempt, he sometimes would not submit overtime slips for short work sessions. He was asked if that was how to get ahead in the Chicago Police Department. Plaintiffs quote part of his reply, implying his answer was equivocal agreement: "I think you get ahead by, if you want to—I think it's just hard work. And if that's part of hard work in getting the job done, maybe." But his full reply was, "No, I don't think so. I mean, I don't think anyone— honestly, I don't think anyone really keeps that close a track of that. I think you get ahead by, if you want to—I think it's just hard work. And if that's part of hard work in getting the job done, maybe. But just the fact that, oh, I worked overtime, didn't put a slip in, there's guys in these units, Detective Division and in Organized Crime, that have prolific amounts of overtime, and they still get promoted and get ahead." This court has cautioned counsel to be conscientious when editing quotations to avoid giving the appearance of trying to mislead the court. See *Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063, 1069 (7th Cir. 2000); *United States v. Burrell*, 963 F.2d 976, 983–84 (7th Cir. 1992); *Duggan v. Board of Education of East Chicago Heights*, 818 F.2d 1291, 1297 n.14 (7th Cir. 1987).

court reasonably found that plaintiffs' proposal was "extremely impractical."

Finally, plaintiffs attempt to undercut the force or credibility of various evidence, pointing out, for example, that one supervisor testified that her subordinate submitted slips for phone calls but did not produce those slips, that another testified about a misdated slip and others submitted recently, and that a third was not sure whether his subordinate's off-duty phone calls were made on his BlackBerry. Plaintiffs also point out that the district court mistakenly implied that a particular person testified when in fact someone else testified about him. This is not the stuff from which clear errors are made. We do not sit to re-weigh the district court's plausible findings about credibility, much less the occasional scrivener's error. See *TABFG, LLC v. Pfeil*, 746 F.3d 820, 823 (7th Cir. 2014) (clear error standard requires special deference to the district court's determinations of credibility); *Fyrnetics (Hong Kong) Ltd. v. Quantum Group, Inc.*, 293 F.3d 1023, 1028 (7th Cir. 2002) (clear error standard does not permit reversal based on re-weighing evidence), quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985).

We do not mean to imply that plaintiffs had no evidence in their favor. As the district court found, "many plaintiffs credibly testified that they did not submit" slips for off-duty BlackBerry work. Some said that was because of the Bureau's culture or out of concern for their positions. One plaintiff, a supervisor, told his subordinates that others might frown on such slips. We are especially troubled by the 2010 General Order and the accompanying compliance statement, which announced that employees "will not be compensated" for Black-

Berry work except under certain circumstances. That language appears to run flatly contrary to the Bureau's FLSA obligations.[5] The Bureau says that the order still permitted compensation in most circumstances, but that argument is cold comfort: the Bureau cannot refuse to compensate any of its employees' work. If the Bureau had won summary judgment, or judgment as a matter of law, this appeal would present very different issues.

But having correctly proceeded to trial, the district court was not obliged to resolve conflicts in the evidence in plaintiffs' favor. And there were conflicts in the evidence. While witnesses blamed the Bureau for their reluctance to submit overtime slips, they could not point to anything the Bureau did to cause that reluctance—not instructions, discipline, or reprimands. Some officers did submit slips for BlackBerry work, and the Bureau paid them.[6] As for the General Orders,

---

[5] The trial testimony also reflected some employee confusion about the circumstances in which they needed to submit slips. One can certainly argue that an employer has not created a reasonable reporting system—has not been reasonably diligent—if its employees do not know when to use that system. See *Craig*, 823 F.3d at 390 (reversing summary judgment for employer in part because it was "unclear whether Craig even knew she was allowed to petition for overtime compensation at all"). But that was not plaintiffs' theory at trial, so the district court did not and we do not draw any conclusions from that testimony.

[6] Plaintiffs explain this evidence with a more elaborate version of their unwritten-policy theory. On this account, the Bureau's unwritten policy had (at least) two exceptions: it would pay for BlackBerry work so long as the work session was long enough or the work was part of an "official assignment" (an undefined term). At some point, elaborating a theory to avoid bad facts looks like *post hoc* rationalization—the equivalent of Ptolemaians adopting epicycles to fit their geocentric theory to inconvenient

the district court found that no plaintiff stopped submitting slips and no supervisor refused to approve slips because of them. Plaintiffs point to no contrary evidence on appeal. As unfortunate as the Bureau's phrasing was in the General Order, we are not "left with the definite and firm conviction that a mistake has been committed." *Furry v. United States*, 712 F.3d 988, 992 (7th Cir. 2013) (defining clear error) (citation omitted).

The judgment of the district court is AFFIRMED.

---

facts instead of adopting Copernican heliocentrism. The court was not obliged to accept plaintiffs' explanations.